**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONNA PORTER, KIMBERLY DEAN,
DIANN WOOD, JULIE FRAME, YVONNE
PREUITT, DORIS McCLELLAND, and
BARBARA SIMPSON,

        Plaintiffs,

                                    Case No. 13-13855

v.                               Hon. Gerald E. Rosen

FIVE STAR QUALITY CARE-MI, LLC and
FARMINGTON NURSING, LLC,

        Defendants.
_____/

**OPINION AND ORDER REGARDING DEFENDANT**
**FIVE STAR'S MOTIONS FOR SUMMARY JUDGMENT**
**AND PLAINTIFFS' MOTION TO AMEND COMPLAINT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____June 20, 2014_____

PRESENT:  Honorable Gerald E. Rosen
                  Chief Judge, United States District Court

## I.  INTRODUCTION

Plaintiffs Donna Porter, Kimberly Dean, Diann Wood, Julie Frame, Yvonne

Preuitt, Doris McClelland, and Barbara Simpson commenced this suit in this Court on

September 10, 2013, asserting claims under the federal Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 *et seq.,* and state-law breach of contract claims against

Defendants Five Star Quality Care-MI, LLC ("Five Star") and Farmington Nursing, LLC

("White Pine").[1]  Plaintiffs' claims arise from Defendant Five Star's sale of a nursing home in Farmington, Michigan to Defendant White Pine, with Plaintiffs alleging that Defendants (i) unlawfully terminated their employment at the Farmington facility in connection with this sale, and (ii) failed to pay all of the compensation due to Plaintiffs upon the termination of their employment.  This Court's subject matter jurisdiction over this action rests upon Plaintiffs' assertion of claims arising under federal law.  *See* 28 U.S.C. § 1331.

Through the present pair of motions, Defendant Five Star seeks an award of summary judgment in its favor on Plaintiffs' claims against it, as well as an award of summary judgment in its favor on a crossclaim brought by Five Star against co-Defendant White Pine.  In support of the first of these motions, Five Star argues that Plaintiffs cannot show that Five Star discharged them in retaliation for their exercise of rights under the FMLA, where Five Star terminated the entire workforce at the Farmington facility, and not just Plaintiffs, in connection with its sale of the facility to Defendant White Pine. Five Star further contends that none of the Plaintiffs has pled a viable breach of contract claim.  In support of its second motion, Five Star asserts that White Pine owes a duty under the purchase agreement for the Farmington facility to defend and indemnify Five Star against any liability or expense arising out of any cause of action that accrued after

_____

[1]Defendant Farmington Nursing, LLC does business under the name of White Pine Rehabilitation & Healthcare of Farmington.  The parties refer to this entity as White Pine, and the Court will do likewise in the present opinion.

the sale of the facility, and it contends that White Pine has breached this duty by failing to assume Five Star's defense of this case or reimburse Five Star for the attorney fees and costs it has incurred to date.

Each of Five Star's motions has been fully briefed by the parties. Having reviewed the parties' briefs in support of and opposition to these motions, as well as the accompanying exhibits and the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide Five Star's motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion and order sets forth the Court's rulings on these motions.

## II.  <u>FACTUAL BACKGROUND</u>

In October of 2012, Defendant Five Star entered into a "Purchase and Sale and Operations Transfer Agreement" (the "Purchase Agreement") with co-Defendant White Pine,[2] under which Five Star agreed to sell a Farmington nursing home and other assets to White Pine. (*See* R. 36, 10/2/2012 Purchase Agreement.) Through a subsequent amendment to the Purchase Agreement, Five Star and White Pine agreed to a closing date of April 30, 2013 for the sale of the Farmington facility, and they agreed that Five Star

---

[2]To be accurate, the sellers under the Purchase Agreement were Five Star and two affiliated entities, while the purchaser was identified as Persimmon Ventures, LLC. The parties apparently agree that the Defendant referred to in Plaintiffs' complaint as White Pine is essentially the same entity as Persimmon Ventures.

would continue to operate the facility "through 11:59 p.m. on the Closing Date" and would "be responsible for the expenses and entitled to the income relating to such operations on the Closing Date." (R. 36, Third Amendment to Purchase Agreement at ¶¶ 1.1, 1.2.) It is undisputed that all seven of the Plaintiffs were employed at the Farmington facility as of the closing date of April 30, 2013. (*See* First Amended Complaint at ¶ 11.)

Two provisions of the Purchase Agreement are especially pertinent to the issues presented in Five Star's two pending motions. First, the Purchase Agreement called for Five Star to "terminate . . . the employment of each of the employees at its [Farmington] facility immediately prior to the Closing," and provided that White Pine would then "offer substantially all such employees the opportunity to continue his/her employment in a similarly situated position, with compensation and benefits comparable to those provided to such employees by [Five Star] immediately prior to the Closing." (R. 36, Purchase Agreement at ¶ 8.5.)[3] Next, the Purchase Agreement contained the following indemnification provision:

> [White Pine] will defend, indemnify and hold [Five Star] harmless from and against any and all liability, damage, loss, cost, or expense arising out of or otherwise in connection with: . . . (c) any cause of action accruing from and after the Closing Date under or with respect to the Facilities or the operation thereof . . .; and/or (e) any and all third party claims, including any suit, action, or other proceeding brought by applicable Governmental Authorities against [Five Star] or its Facility (i) arising from the operation

---

[3]Five Star also was required under the Purchase Agreement to convey its "Facility Records" to White Pine in connection with the sale of the Farmington facility, (*id.* at ¶ 6.1(r)), with "Facility Records" defined as "all files and records pertaining to the residents and employees of such Facility which are located at such Facility on the Closing Date," (*id.* at ¶ 1.1).

thereof by [White Pine] from and after . . . the Closing Date . . . .

(*Id.* at ¶ 11.4.)

According to the complaint, Plaintiffs and the other Five Star employees who worked at the Farmington facility were advised shortly before the closing date that White Pine would be assuming the operation of the facility.  (*See* First Amended Complaint at ¶ 10.)  Plaintiffs and their fellow employees were further informed that their employment would be terminated by Five Star, and that they would have to submit applications to White Pine if they wished to continue working at the Farmington facility.  (*See id.*)  On or around the closing date of April 30, 2013, Five Star terminated Plaintiffs' employment, and each of the Plaintiffs submitted an application for employment with White Pine.  (*See id.* at ¶ 11.)

All but one of the Plaintiffs were hired by White Pine for a day or two after White Pine assumed control of the Farmington facility on May 1, 2013, but each of these Plaintiffs was then "advised that [her] employment by White Pine was terminated."  (*Id.* at ¶ 12.)  The remaining Plaintiff, Julie Frame, was on medical leave at the time that Five Star transferred the operation of the Farmington facility to White Pine, and she, unlike the other Plaintiffs, was never hired by White Pine to continue working at the facility.  (*See id.* at ¶¶ 9, 12.)

This lawsuit followed on September 10, 2013, with Plaintiffs asserting federal FMLA claims and state-law breach of contract claims against both Five Star and White

5

Pine.  In support of their FMLA claims, Plaintiffs allege that White Pine terminated their employment shortly after its purchase of the Farmington facility — or, in the case of Plaintiff Frame, elected not to extend an offer of employment — on the impermissible ground that Plaintiffs had exercised their FMLA rights while employed by Five Star by taking medical leaves of absence.  (*See id.* at ¶¶ 9, 16-17.)  Plaintiffs further allege that Five Star and White Pine "acted in concert" to retaliate against Plaintiffs' exercise of their rights under the FMLA, with Five Star having provided the records through which White Pine determined that each of the Plaintiffs had previously taken FMLA leave.  (*Id.* at ¶¶ 18-19.)[4]  Plaintiffs' breach of contract claims rest upon allegations that at the time of their discharge, each of them was owed compensation by Five Star and/or White Pine in accordance with the terms of their employment, but that at least "[s]ome of the Plaintiffs have not received all of the compensation due to them."  (First Amended Complaint at ¶¶ 23-24.)

## III. <u>ANALYSIS</u>

### A.     The Standards Governing Defendant Five Star's Motions

Through its pair of pending motions, Defendant Five Star seeks (i) the dismissal of Plaintiffs' claims against it or, alternatively, an award of summary judgment in its favor

---

[4]According to Plaintiffs' proposed second amended complaint, Five Star was "directly involved with and assisted" in White Pine's retaliatory discharge of Plaintiffs in violation of the FMLA, and took various steps to facilitate this retaliation, such as "color-coding" employee files to identify those individuals who had taken FMLA leave.  (R. 55, Plaintiffs' Motion to Amend Complaint, Ex. 1, Proposed Second Amended Complaint at ¶¶ 19, 22.)  As discussed below, a motion for leave to file this second amended complaint is presently pending before the Court.

as to these claims, and (ii) an award of summary judgment in its favor as to its crossclaim against co-Defendant White Pine.  To the extent that Five Star moves for the dismissal of Plaintiffs' claims under Fed. R. Civ. P. 12(c), the standards governing the Court's review are the same as those that apply to a motion brought under Fed. R. Civ. P. 12(b)(6).  *See Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,* 477 F.3d 383, 389 (6th Cir. 2007).  In particular, the Court must construe the complaint in a light most favorable to Plaintiffs and accept all of the complaint's well-pleaded factual allegations as true. *League of United Latin American Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Yet, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  Moreover, "[w]hile a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (internal quotation marks, alteration, and citations omitted).  Rather, to withstand a motion to dismiss, the complaint's factual allegations, accepted as true, "must be enough to raise a right to relief above the speculative level," and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570, 127 S. Ct. at 1965, 1974.

To the extent that Five Star seeks an award of summary judgment in its favor,

whether as to Plaintiffs' claims against it or as to its crossclaim against Defendant White Pine, the applicable Federal Rule provides that summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial — as here, where Five Star requests summary judgment in its favor on its crossclaim against co-Defendant White Pine — the movant's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

8

or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."
Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be
made on personal knowledge, set out facts that would be admissible in evidence, and
show that the affiant or declarant is competent to testify on the matters stated." Fed. R.
Civ. P. 56(c)(4). Further, "the mere existence of a scintilla of evidence that supports the
nonmoving party's claims is insufficient to defeat summary judgment," *Pack,* 434 F.3d at
814 (alteration, internal quotation marks, and citation omitted), and the nonmoving party
must "do more than show that there is some metaphysical doubt as to the material facts"
in order to withstand a properly supported summary judgment motion, *Petroleum
Enhancer, LLC v. Woodward,* 690 F.3d 757, 772 (6th Cir. 2012) (internal quotation
marks and citation omitted).

It is important to note that Five Star brought its present motions fairly early in this
litigation, when the parties had only recently commenced their discovery efforts and no
witnesses had yet been deposed. Under these circumstances, Rule 56(d) permits the
nonmoving party to "show[] by affidavit or declaration" that "it cannot present facts
essential to justify its opposition" to a summary judgment motion, and the Court may then
"defer considering the motion or deny it," or may grant the nonmoving party an
opportunity to take discovery that would enable it to identify issues of fact warranting
denial of the motion. Fed. R. Civ. P. 56(d). Where, as here, a summary judgment motion
is filed "early in the litigation, before a party has had any realistic opportunity to pursue

9

discovery relating to its theory of the case," a district court should "fairly freely" grant the relief authorized under Rule 56(d). *Burlington Northern Santa Fe Railroad Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation,* 323 F.3d 767, 773 (9th Cir. 2003). Nonetheless, "[b]are allegations or vague assertions of the need for discovery are not enough under Rule 56([d])," and Plaintiffs (through their counsel) must "describe with some precision the materials [they] hope[] to obtain with further discovery, and exactly how [they] expect[] those materials would help [them] in opposing summary judgment." *Everson v. Leis,* 556 F.3d 484, 493 (6th Cir. 2009) (internal quotation marks and citations omitted).

**B.   The Court Cannot Conclude as a Matter of Law That Plaintiffs' FMLA Claims Against Five Star Lack Viability Under the Facts Alleged in the Complaint.**

As the first issue raised in its motion directed at Plaintiffs' claims, Defendant Five Star argues that Plaintiffs cannot hope to establish a factual basis for their FMLA claims against Five Star because this company terminated ***all*** of its employees at the Farmington facility, as called for in the Purchase Agreement between Five Star and White Pine.  In Five Star's view, this blanket termination of all employees defeats Plaintiffs' claim that they were singled out for adverse action in light of their history of taking FMLA leave. As discussed below, however, the Court reads Plaintiffs' complaint as advancing a somewhat different theory of Five Star's liability under the FMLA, and the Court cannot say at the present juncture, with the parties still engaged in discovery, that Plaintiffs will

10

be unable to identify factual support for this theory of FMLA liability.

The Sixth Circuit "recognizes two distinct theories of wrongdoing under the FMLA," the "'entitlement' or 'interference' theory" and the "'retaliation' or 'discrimination' theory." *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir. 2007). Plaintiffs here are pursuing the latter theory, alleging that Defendants "Five Star and White Pine acted in concert to retaliate against the Plaintiffs for their exercise of FMLA rights." (First Amended Complaint at ¶ 17.) In the absence of "direct evidence of unlawful conduct," Plaintiffs' FMLA claims of retaliation "are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bryson,* 498 F.3d at 570.[5] Under the first step of this *McDonnell Douglas* approach, Plaintiffs must establish a *prima facie* case of retaliation by showing (1) that they engaged in activity protected under the FMLA, (2) that they suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. *Bryson,* 498 F.3d at 570; *see also Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d

---

[5]At least one Plaintiff, Diann Wood, arguably can avoid this *McDonnell Douglas* analysis by pointing to direct evidence that her discharge was attributable to her prior use of FMLA leave. In particular, Plaintiffs have alleged in their complaint, and Ms. Wood likewise has stated in an affidavit, that Ms. Wood was expressly advised by Jeanette Reichner, the nursing home administrator for the Farmington facility, that the decision to terminate her employment "was made because of [her] prior FMLA leave." (First Amended Complaint at ¶ 15; *see also* R. 57, Plaintiffs' Response, Ex. A, Joint Aff. of Diann Wood and Renita Austin at ¶ 7.) Nonetheless, the Court need not decide at this point whether each of the Plaintiffs must satisfy the *McDonnell Douglas* standard in order to go forward with their FMLA claims of retaliation, in light of the Court's resolution of Five Star's challenge to Plaintiffs' FMLA claims on other grounds.

309, 314 (6th Cir. 2001).

Five Star does not dispute, for present purposes, that Plaintiffs engaged in protected activity by taking FMLA leave, and that the termination of their employment at the Farmington facility qualifies as an adverse employment action. Five Star contends, however, that Plaintiffs cannot establish the causal connection element of their *prima facie* case of retaliatory discharge because Five Star terminated all of its employees at the Farmington facility, and not just those who took FMLA leave or otherwise engaged in protected activity. Since Plaintiffs would have suffered the same fate whether or not they had taken FMLA leave, Five Star asserts that its across-the-board termination of all employees at the Farmington facility defeats any claim of a causal link between Plaintiffs' FMLA leave and Five Star's termination of their employment.[6] Similarly, even assuming that Plaintiffs could establish a *prima facie* case of retaliation, Five Star argues that it would prevail as a matter of law under the two remaining steps of the *McDonnell Douglas* inquiry: its termination of the Farmington workforce can be explained on the legitimate, non-retaliatory ground that this action was dictated under the express terms of

---

[6]To the extent that Five Star faults Plaintiffs for failing to plead the "causal connection" element of a *prima facie* case of FMLA retaliation, the Supreme Court has emphasized that "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510, 122 S. Ct. 992, 997 (2002). Moreover, because an employer's motive is "an integral part of the analysis" of an FMLA retaliation claim, *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 508 (6th Cir. 2006), the Court must be especially cautious in evaluating Plaintiffs' FMLA claims against Five Star on the pleadings alone, before Plaintiffs have had a meaningful opportunity to explore this question of motive (as well as other pertinent factual issues) in discovery.

the Purchase Agreement entered into with White Pine, and Plaintiffs have not alleged, nor can they hope to show, that this stated reason for Plaintiffs' termination is a pretext for retaliation.

Five Star's challenge to Plaintiffs' FMLA claims, however, rests on a mistaken characterization of the adverse employment action giving rise to these claims. In particular, these claims are not based solely on the termination of Plaintiffs' employment by Five Star in connection with its sale of the Farmington facility to White Pine, but rather on a ***combination*** of Five Star's discharge of these employees ***and*** White Pine's failure to re-hire them for more than a few days. As set forth in their complaint, Plaintiffs allege that Five Star and White Pine "acted in concert" through Five Star's "decision to terminate the employment of each of the Plaintiffs" ***and*** "White Pine's decision either not to hire certain of the Plaintiffs or to hire them and shortly thereafter to terminate their employment," with these decisions allegedly made "in retaliation against the Plaintiffs for exercising their rights under the FMLA." (First Amended Complaint at ¶¶ 17-18.) The pertinent question, then, is whether Plaintiffs can identify a legally viable basis for charging Five Star with liability for allegedly playing a role in the overarching adverse employment action set forth in Plaintiffs' complaint — namely, the termination of Plaintiffs' employment within, at most, a few days after White Pine assumed control of the Farmington facility.

Unfortunately, the parties' discussion of this question in their briefs is not

13

especially illuminating or on point.  Five Star begins by citing an unpublished out-of-circuit district court decision holding that under Kansas law, "an FMLA violation does not constitute an actionable underlying tort upon which a civil conspiracy claim may rest."  *White v. Graceland College Center for Professional Development & Lifelong Learning, Inc.,* No. 07-2319, 2008 WL 4148602, at *2-*3 (D. Kan. Sept. 4, 2008).  Plaintiffs counter by pointing to an unpublished ruling from within this District that, in their view, implicitly recognizes the possibility that a "concerted effort between [two] defendants in violation of the FMLA" could form the basis for a civil conspiracy claim under Michigan law.  *Demyanovich v. Cadon Plating & Coatings, LLC,* No. 10-15119, 2011 WL 3027901, at *6-*7 (E.D. Mich. July 25, 2011).  The Court views these cases as immaterial to the present inquiry, as they address the availability of a ***state law*** claim of civil conspiracy resting upon an underlying violation of the FMLA.[7]  Here, in contrast, Plaintiffs seek to hold Five Star and White Pine liable under ***the FMLA itself***, and not state law, for allegedly terminating their employment in retaliation against Plaintiffs' exercise of their FMLA-protected right to family or medical leave.  Indeed, while

_____

[7]Although Plaintiffs assert that "[t]he *Demyanovich* decision certainly recognizes that a conspiracy claim can be stated ***under the FMLA***," this contradicts Plaintiffs' observation just two sentences earlier that in addressing the allegations of conspiracy in *Demyanovich*, "Judge Cohn first analyzed the requirements ***under Michigan law*** to state a civil conspiracy claim." (Plaintiffs' Response Br. at 14 (emphasis added).)  A review of *Demyanovich* itself confirms that in the pertinent portion of that decision, the court confines its analysis solely to a state law claim of civil conspiracy.  *See Demyanovich,* 2011 WL 3027901, at *6-*7.  Likewise, the other case cited by Plaintiffs as purportedly recognizing the availability of a conspiracy claim "under the FMLA," (Plaintiffs' Response Br. at 14 n.17), actually addresses a claim of civil conspiracy under Ohio law.  *See Aldrich v. Greg,* 200 F. Supp.2d 784, 789-90 (N.D. Ohio 2002).

14

Plaintiffs have amended their initial complaint as of right, and while they seek leave to amend their complaint a second time, they have never yet sought to pursue a claim of civil conspiracy under Michigan law.  Consequently, the Court has no occasion to decide whether Michigan law would recognize a civil conspiracy claim predicated on an underlying violation of the FMLA committed by two defendants acting in concert.

Next, Five Star points to provisions in the FMLA and its implementing regulations that contemplate the imposition of liability on an employer's successor in interest, while making no reference to any possibility of predecessor liability.  *See, e.g.,* 29 U.S.C. § 2611(4)(A)(ii)(II) (defining an "employer" as including "any successor in interest of an employer"); 29 C.F.R. § 825.104(a) (likewise providing that "[e]mployers covered by the FMLA . . . include . . . any successor in interest of a covered employer").  Yet, as Plaintiffs correctly observe in response, their FMLA-based theory of recovery against Five Star does not seek to hold an "innocent predecessor" liable "for the employment-related decisions of a successor," but instead rests upon the premise that "a predecessor who works in concert with a successor to effect illegal employment actions" may be held liable along with the successor for such violations.  (Plaintiffs' Response Br. at 12.)  Unfortunately, while Plaintiffs baldly assert that a predecessor "must" be subject to liability under these circumstances, (*id.*), the argument that follows rests solely upon *Demyanovich'*s discussion of a state law claim of civil conspiracy.

Thus left by the parties to its own devices, the Court has identified two FMLA-

15

based theories through which the allegations made by Plaintiffs in this case, if proven, might suffice to permit a recovery against Five Star under this federal statute. First, the FMLA and its implementing regulations recognize the concept of "joint employment," under which two "separate legal entities" choose "to handle certain aspects of their employer-employee relationships jointly." *Grace v. USCAR,* 521 F.3d 655, 665 (6th Cir. 2008) (internal quotation marks and citations omitted). This notion of joint employers rests in part on the FMLA's definition of an "employer," which encompasses "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(d) ("An employer includes any person who acts directly or indirectly in the interest of an employer to any of the employer's employees.").[8] In addition, the pertinent regulation enacted by the Secretary of Labor pursuant to the authority granted in the FMLA, *see* 29 U.S.C. § 2654, provides that "[w]here two or more businesses exercise some control over the work or working conditions of the employee, the businesses may be joint employers under FMLA," 29 C.F.R. § 825.106(a). This regulation further emphasizes that "[j]oint employers may be separate and distinct entities with separate owners, managers, and facilities." 29 C.F.R. § 825.106(a); *see also Grace,* 521 F.3d at 665.

In *Grace,* 521 F.3d at 666-67, the Sixth Circuit found that a joint employment

---

[8]The term "person," in turn, is defined as "an individual, partnership, association, corporation, business trust, legal represenative, or any organized group of persons." 29 U.S.C. § 2611(8) (incorporating by reference the definition set forth at 29 U.S.C. § 203(a)).

16

arrangement existed where each of the two defendant organizations "exercised significant control over" the plaintiff employee, Rosalyn Grace.  In particular, one of the defendants was a staffing agency that "manage[d] [Grace's] payroll and benefits," while the other defendant "supervis[ed] her day-to-day work and determin[ed] her salary and hours."  521 F.3d at 667.  Other courts have recognized under similar facts that a temporary employment agency and the company with which the agency places an employee may qualify as joint employers under the FMLA.  *See, e.g., Cuellar v. Keppel Amfels, L.L.C.,* 731 F.3d 342, 345-47 (5th Cir. 2013); *Moldenhauer v. Tazewell-Pekin Consolidated Communications Center,* 536 F.3d 640, 643-45 (7th Cir. 2008).  More generally, in determining whether a joint employment arrangement exists, the courts have asked whether "each alleged employer . . . exercise[s] control over the working conditions of the employee," and have considered such factors as (1) the "power to hire and fire employees," (2) the exercise of "supervis[ion] and control[] [over] employee work schedules or conditions of payment," (3) the authority to "determine[] the rate and method of payment," and (4) the "maintain[ance] of employment records."  *Moldenhauer,* 536 F.3d at 644 (internal quotation marks and citations omitted).

Returning to the present case, the facts alleged by Plaintiffs do not give rise to the same sort of joint employment relationship addressed in *Grace* and the other above-cited cases, where the plaintiff employee was assigned by a staffing agency to work at another firm.  Nonetheless, Plaintiffs' allegations may potentially be read as indicating that even

17

after Five Star terminated the employees at the Farmington nursing home in connection with the sale of this facility to White Pine, Five Star continued to exercise some degree of control over these employees by participating in or somehow influencing White Pine's decisions as to which of these employees to rehire and how long to retain those who were rehired.  Although Plaintiffs' complaint is somewhat vague as to the means by which Five Star might have continued to exercise control over Plaintiffs' employment after their termination in connection with the sale of the facility, and as to the precise role Five Star might have played in White Pine's subsequent rehiring and firing decisions, Plaintiffs have not yet had a full opportunity to explore these questions in discovery by identifying and deposing the Five Star and White Pine officials who were involved in the challenged decisions to discontinue Plaintiffs' employment.[9]  Accordingly, the Court believes that Plaintiffs should be granted the opportunity to pursue this theory of FMLA liability, and to more specifically plead this theory in an amended complaint in the event that their discovery efforts disclose a basis for treating Five Star and White Pine as joint employers under the FMLA.

Next, the FMLA's definition of an "employee" provides a second possible avenue through which Plaintiffs may seek to impose FMLA-based liability upon Five Star.  In

---

[9]The limited record presently before the Court indicates that at least two management officials who apparently played a role in these decisions — nursing home administrator Jeanette Reichner and human resources manager Candle Meyers — held the same or similar management positions at the Farmington facility both before and after Five Star sold the facility to White Pine. Such common management presumably could have facilitated Five Star's continued involvement in personnel decisions even after White Pine assumed ownership of the facility.

*Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S. Ct. 843, 849 (1997), the Supreme

Court held that the term "employee" as used in Title VII of the Civil Rights Act of 1964

encompasses former employees.  In light of this ruling, the plaintiff employee in that case

was permitted to go forward with his Title VII claim that his former employer unlawfully

disparaged him to a prospective employer in retaliation for his having filed a charge of

race discrimination against his former employer with the Equal Employment Opportunity

Commission.  *See Robinson,* 519 U.S. at 339-40, 346, 117 S. Ct. at 845, 849.  The

holding in *Robinson* has been carried over to the FMLA, with the courts observing that

the Title VII and FMLA definitions of an "employee" are identical.  *See, e.g., Smith v.*

*BellSouth Telecommunications, Inc.,* 273 F.3d 1303, 1307-13 (11th Cir. 2001);

*Duckworth v. Pratt & Whitney, Inc.,* 152 F.3d 1, 4-11 (1st Cir. 1998); *Khami v. Ortho-*

*McNeil-Janssen Pharmaceutical, Inc.,* No. 09-11464, 2012 WL 414812, at *15 (E.D.

Mich. Feb. 8, 2012); *see also Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 142-47 (6th

Cir. 1977) (finding that a former employee is protected against retaliation by his former

employer under the Fair Labor Standards Act, the statute from which the FMLA borrows

its definition of an "employee").

    Under this line of cases, Plaintiffs' status as former employees of Five Star would

not necessarily preclude them from pursuing FMLA claims against their former employer,

provided that they allege and produce evidence that Five Star retaliated against Plaintiffs'

exercise of rights protected under the FMLA by somehow discouraging White Pine from

rehiring and retaining Plaintiffs as employees at the Farmington facility.  Again, the allegations of Plaintiffs' present complaint are at least suggestive of this theory of recovery, with Plaintiffs alleging that they were "targeted" for termination by Five Star and White Pine "act[ing] in concert" in light of their "prior FMLA leaves of absence during their employment with Five Star," and that Five Star records and administrative employees retained by White Pine were the conduits through which Plaintiffs were singled out for discharge due to their past use of FMLA leave.  (First Amended Complaint at ¶¶ 13, 15, 16, 18, 19.)  Thus, the Court finds that Plaintiffs should be given the opportunity to flesh out these allegations through discovery aimed at the process through which it was determined that Plaintiffs would not be retained as employees.

The Court recognizes that Plaintiffs have not expressly pled either of the FMLA-based theories of discovery addressed above.  Moreover, the limited record before the Court does not permit any conclusions as to whether Plaintiffs will be able to marshal sufficient evidence in support of either of these theories, and the Court expresses no view as to the prospects for Plaintiffs' success under either theory.  Nonetheless, the Court likewise cannot say at the present juncture that a potential FMLA-based recovery against Five Star is precluded as a matter of law, or that Plaintiffs' allegations are flatly inconsistent with any viable theory of recovery recognized under the FMLA.  Rather, the Court concludes only that Plaintiffs' complaint is consistent with one or more such recognized theories of recovery, and that Plaintiffs should be permitted to pursue

20

evidentiary support for these FMLA claims in the remainder of the discovery period.[10]

**C.     Plaintiffs Are Entitled to Take Discovery in Support of Their Breach of Contract Claims Against Five Star.**

In Count II of their first amended complaint, Plaintiffs assert breach of contract claims against both Five Star and White Pine, alleging that Plaintiffs were not paid all of the compensation due to them under the terms of their employment relationships with the two Defendant firms.  Through its present motion, Five Star seeks an award of summary judgment in its favor on the breach of contract claims asserted against it, arguing that the record establishes as a matter of law that Five Star paid each Plaintiff all of the compensation owed to her through April 30, 2013, the date that Five Star terminated the employment of each of the Plaintiffs.

The Court acknowledges that under the present record, Plaintiffs cannot establish that Five Star has failed to pay any compensation owed to them as a result of their employment with this firm.  In particular, Five Star points to the affidavit of its vice president of human resources, Janet Mercier, stating that Plaintiffs were paid all

---

[10]As noted earlier, Plaintiffs have filed a motion for leave to amend their complaint a second time, primarily so that they can "more clearly articulate their conspiracy claims against defendants."  (Plaintiffs' 3/14/2014 Motion to Amend at 1.)  Yet, as explained above, Plaintiffs have failed to identify any legal support for an FMLA-based claim of conspiracy, nor have they expressed any intention to pursue a civil conspiracy claim under state law.  Accordingly, Plaintiffs' present request for leave to amend their complaint will be denied, but without prejudice to Plaintiffs' opportunity to file a motion seeking to augment their complaint with allegations more specifically directed at the FMLA-based theories of recovery discussed in this opinion, or with allegations in support of any other viable theory of recovery Plaintiffs may wish to pursue.  The Court, of course, expresses no view as to whether Plaintiffs will be able to establish their entitlement to relief in any such motion they may choose to file.

outstanding compensation owed to them and were reimbursed for all unused paid time off ("PTO") hours upon Five Star's termination of their employment, (*see* Five Star's Motion, Ex. 1, Mercier Decl. at ¶¶ 16-21), and Plaintiffs have not produced any evidence that would cast doubt upon Ms. Mercier's assertions on these points.[11]  Yet, as of the date Five Star filed its motion, Plaintiffs had not yet had an opportunity to depose Ms. Mercier or any other Five Star official with knowledge of the company's payroll records in order to explore whether Five Star has paid each Plaintiff all that she was owed upon her termination.  In light of the present procedural posture of this case, with the parties' discovery efforts still ongoing, the Court finds that Five Star's challenge to Plaintiffs' breach of contract claims should be denied as premature.

**D.    White Pine Owes a Duty to Indemnify Five Star for Any Liability or Costs Arising from Plaintiffs' FMLA Claims, Which Accrued at the Earliest on May 1, 2013.**

In the second of its two pending motions, Defendant Five Star seeks an award of summary judgment in its favor on its crossclaim against co-Defendant White Pine, arguing that the record establishes as a matter of law that White Pine has breached a duty of indemnification owed to Five Star under the Purchase Agreement entered into by the parties.  Although the arguments advanced by Five Star and White Pine with respect to this motion seem to evolve with each successive submission, and although the parties

---

[11]Indeed, as Five Star observes, Plaintiffs' response to Five Star's motion is utterly silent as to their breach of contract claims, and makes no attempt to refute Five Star's arguments as to these claims.

have displayed a frustrating tendency to alter or disregard the language of the Purchase Agreement as it suits their ever-shifting positions, the Court finds that the plain language of the Purchase Agreement itself dictates a judgment largely (though not entirely) in Five Star's favor on its crossclaim against White Pine.

As both Five Star and White Pine agree, an indemnification agreement "is to be construed in the same fashion as other contracts." *Zahn v. Kroger Co.,* 483 Mich. 34, 764 N.W.2d 207, 210 (2009).[12]  "Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Insurance Co. v. Kneeland,* 464 Mich. 491, 628 N.W.2d 491, 494 (2001). Accordingly, the Court turns to the pertinent indemnification provision in the parties' Purchase Agreement, which states in relevant part:

> **11.4   Purchaser's Indemnification.**  Purchaser will defend, indemnify and hold Sellers harmless from and against any and all liability, damage, loss, cost, or expense arising out of or otherwise in connection with:  . . . (c) any cause of action accruing from and after the Closing Date under or with respect to the Facilities or the operation thereof . . .; and/or (e) any and all third party claims, including any suit, action, or other proceeding brought by applicable Governmental Authorities against any Seller or its Facility (i) arising from the operation thereof by Purchaser from and after . . . . the Closing Date . . . .

(Purchase Agreement at ¶ 11.4.)  In its present motion, Five Star focuses on clause (c) of this provision, arguing that the claims asserted against it by Plaintiffs in this case accrued

---

[12]The parties further agree that the interpretation of their agreement is governed by Michigan law, and the Purchase Agreement itself so provides.  (*See* Purchase Agreement at ¶ 12.18.)

"from and after the Closing Date" of April 30, 2013[13] and concern the Farmington facility "or the operation thereof." It follows, in Five Star's view, that White Pine has a duty to defend and indemnify Five Star against any and all liability, cost, or expense that it might incur as a result of Plaintiffs' claims in this case.

As to Plaintiffs' FMLA claims, the Court readily agrees. As discussed earlier, these claims rest upon the allegations (i) that Five Star and White Pine acted in concert to terminate Plaintiffs' employment within, at most, a few days after White Pine assumed control of the Farmington facility,[14] and (ii) that these actions were taken in retaliation against Plaintiffs' exercise of their rights under the FMLA. Although the parties devote little (if any) of their briefing to a discussion of when these claims might have accrued, it is evident to the Court that they accrued, at the earliest, when White Pine began to operate the Farmington facility, and the parties agree that this occurred on May 1, 2013. (*See* Five Star's Reply Br. at 6 (identifying May 1, 2013 as the date "White Pine began operating the Farmington Facility"); White Pine's Sur-Reply Br. at 1 (likewise identifying May 1, 2013 as "the date the Farmington facility was transferred to the ownership and

---

[13]As noted earlier, the parties executed a "Third Amendment" to the Purchase Agreement which provided, among other things, that the "Closing Date" "shall mean April 30, 2013." (R. 36, Third Amendment to Purchase Agreement at ¶ 1.1.)

[14]According to Plaintiffs' First Amended Complaint, six of the seven Plaintiffs continued working for White Pine for a few days after White Pine began operating the Farmington facility on May 1, 2013, while Plaintiff Julie Frame was never rehired by White Pine after Five Star terminated her employment on or around May 1, 2013. (*See* First Amended Complaint at ¶¶ 11-12.)

operation by White Pine").)  While Five Star terminated Plaintiffs (along with all of the

other employees at the Farmington facility) "immediately prior to the Closing," as called

for in the parties' agreement, (*see* Purchase Agreement at ¶ 8.5), the Court has already

explained that this action alone could not sustain Plaintiffs' claims under the FMLA, as it

affected ***all*** employees at the Farmington facility, and not just those who exercised rights

protected under the FMLA.  Rather, Plaintiffs' FMLA claims arise from Defendants'

allegedly concerted and retaliatory decision not to retain or rehire them after White Pine

assumed control of the facility, and Plaintiffs felt the impact of this decision on or after

May 1, 2013, when they were let go — or, in Plaintiff Frame's case, not rehired — by

White Pine.  Consequently, because Plaintiffs' FMLA claims accrued "from and after the

Closing Date" of April 30, 2013, and because these claims plainly relate to "the Facilities

or the operation thereof," the Court finds that they trigger White Pine's duty of

indemnification as set forth in paragraph 11.4, clause (c) of the Purchase Agreement.

White Pine's efforts to avoid this result are unpersuasive, and are largely defeated

by the plain language of the Purchase Agreement itself.  First, White Pine contends that

its duty of indemnification encompasses only those claims that accrued from and after

"the effective Closing Date," and it asserts that this "effective" closing date is May 1,

2013.  (White Pine's Sur-Reply Br. at 3.)  Yet, despite White Pine's misleading use of

quotation marks, clause (c) of the Purchase Agreement's indemnification provision makes

no reference to an "effective" closing date, but instead speaks of causes of action

"accruing from and after the Closing Date."  (Purchase Agreement at ¶ 11.4.)  This "Closing Date," in turn, is unambiguously defined in an amendment to the Purchase Agreement as April 30, 2013.[15]  In any event, even if White Pine's duty of indemnification encompassed only claims accruing "from and after" an "effective" closing date of May 1, 2013, the Court has explained that Plaintiffs' FMLA claims accrued on May 1, 2013 at the earliest, and thus would trigger clause (c) of the indemnification provision even under White Pine's proposed reading of this language.

Next, White Pine attempts to shift the focus of the Court's inquiry to the dates upon which Five Star took "actions" or engaged in "conduct" giving rise to Plaintiffs' claims, (see White Pine's Sur-Reply Br. at 1-3), and it points to allegations in Plaintiffs' complaint indicating that some of the conduct in question occurred on or before April 30, 2013 — i.e., while Five Star still owned and operated the Farmington facility.  Again, however, the plain language of clause (c) of the Purchase Agreement's indemnification provision lacks any mention of the "conduct" or "action" giving rise to a claim, but instead refers to the "accru[al]" of a cause of action as the event that triggers White Pine's

---

[15]To be fair to White Pine, Five Star has advanced the same mistaken interpretation of clause (c), asserting in the initial brief in support of its motion that the closing on the Farmington facility "became effective May 1, 2013," and that White Pine therefore owed a duty to indemnify Five Star as to any cause of action accruing "[f]rom [a]nd [a]fter May 1, 2013."  (Five Star's Motion, Br. in Support at 2, 4.)  Nonetheless, the parties' apparent consensus on this point does not preclude the Court from looking to the plain language of clause (c) itself, which unambiguously imposes a duty of indemnification upon White Pine as to claims "accruing from and after the Closing Date" of April 30, 2013.

duty of indemnification.[16]   As discussed, the FMLA claims pled by Plaintiffs here accrued on or after May 1, 2013.

Finally, White Pine argues that its duty of indemnification extends only to claims that "arise from White Pine's operation of the [Farmington] facility," (White Pine's Response Br. at 1), and it views Plaintiffs' FMLA claims against Five Star as resting upon actions taken by Five Star while it was still the owner and operator of the facility. Yet, while clause (e) of the indemnification provision references "third party claims . . . arising from the operation [of the facility] *by Purchaser*," (Purchase Agreement at ¶ 11.4 (emphasis added)), clause (c) lacks any comparable language limiting White Pine's duty of indemnification to claims arising from *its* operation of the Farmington facility. Instead, clause (c) encompasses any cause of action "with respect to the Facilities or the operation thereof," (*id.*), without specifying whether the cause of action must have accrued as a result of Five Star's or White Pine's operation of the facility.  As White Pine acknowledges, (*see* White Pine's Response Br. at 3 n.1), Five Star's claim for indemnification rests solely upon clause (c) of the indemnification provision, and not clause (e).  Accordingly, White Pine's reliance on the language of clause (e) is unavailing.

---

[16]Once again, it is only fair to observe that Five Star, like White Pine, focuses (rather puzzlingly) on the dates on which conduct occurred, requesting in its initial brief in support of its motion that the Court "[e]nter an order requiring White Pine to indemnify [Five Star] in accordance with the Purchase Agreement . . . relative to any alleged conduct occurring from and after May 1, 2013."  (Five Star's Motion, Br. in Support at 2.)  It is mystifying to the Court why both parties alike deviate time and again from the express terms of the indemnification provision in fashioning arguments about the meaning of this provision.

27

It remains only to inquire whether White Pine's duty of indemnification extends to Plaintiffs' breach of contract claims. The briefs filed by Five Star and White Pine scarcely touch upon these claims, and are utterly silent as to when these claims might have accrued. In addition, the Court observed earlier in this opinion that the precise basis for and scope of Plaintiffs' breach of contract claims remains somewhat unclear at the present juncture, and that these claims remain subject to further development through discovery. Against this uncertain backdrop, the Court declines to rule on White Pine's duty of indemnification as to Plaintiffs' breach of contract claims against Five Star, but instead reserves this question for further consideration following the development of a more complete evidentiary record bearing upon these claims.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Five Star's January 16, 2014 motion for summary judgment on Plaintiffs' claims (docket #37) is DENIED. Next, IT IS FURTHER ORDERED that Defendant Five Star's January 16, 2014 motion for summary judgment on its crossclaim against co-Defendant White Pine (docket #35) is GRANTED IN PART, to the extent that Five Star seeks indemnification for liability and costs incurred with respect to Plaintiffs' claims under the FMLA, and is otherwise DENIED WITHOUT PREJUDICE. Finally, IT IS FURTHER ORDERED that Plaintiffs' March 14, 2014 motion to amend complaint (docket #55) is DENIED, but

without prejudice to Plaintiffs' opportunity to again seek leave to amend their complaint in accordance with the standards of Fed. R. Civ. P. 15(a) and the rulings in the present opinion and order.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  June 20, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 20, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135
